MEMORANDUM OF DECISION
These are actions brought by Department of Children and Families (DCF) seeking (1) to terminate the parental rights of the biological mother and biological father of Daniel C., Jr. and Kimberly C. and (2) seeking an adjudication of the children as neglected. Further, there are pre-trial motions by the parents heard together with this trial in which one or both of the CT Page 10171 parents have filed (1) a Motion for Contempt, and (2) a Motion for Order Re: Unsupervised Visitation.[2]
The biological mother is Linda C. The biological father is Daniel C. Sr. They are married. As of the time of the trial on the merits, these parents live together.
The children are currently in the custody of DCF pursuant to an Order of Temporary Custody (OTC) issued on April 9, 1998. In the trial before this court, the mother and father each had pending a motion for this court to vacate the order, claiming that the cause for that order no longer existed. After the inception of the trial, those motions were withdrawn by both parents.
The neglect petitions subject of this action were filed on April 9, 1998, at the same time as the Motion for Order of Temporary Custody. The standard of proof that DCF must satisfy in its neglect petition is a fair preponderance of the evidence. On May 14, 1998, DCF filed the petitions for termination of parental rights.
Kimberly C. was born on December 16, 1991; Daniel C., Jr. was born on July 3, 1989.
DCF alleges the following grounds for the termination of the parental fights of the biological mother and biological father. DCF alleges as to each of the parents, regarding Daniel C., Jr. and Kimberly C. that (1) the child has been found in a prior proceeding to have been neglected or uncared for, and, each parent, respectively has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, that parent could assume a responsible position in the life of the child. Connecticut General Statutes § 17a-112
(c)(3)(B); and/or (2) the child has been denied by reason of an act or acts of commission by the respective parent the care, guidance or control necessary for the child's physical, educational, moral or emotional well being. Connecticut General Statutes § 17a-112(c)(3)(B); (3) in regard to Kimberly C. only, DCF further alleges as a ground for the termination of the parental rights of the mother that Kimberly C. being under the age of seven years and who is neglected or uncared for, that the mother has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief CT Page 10172 that within a reasonable period of time, considering the age and needs of Kimberly C. that the mother could assume a responsible position in the life of the child, and the mother's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families. Connecticut General Statutes § 17a-112(c)(3)(E).
In pretrial proceedings, DCF disclosed that it could not find certain of its records which constituted social worker narratives for the period of time from September 15, 1995 to December 31, 1996 for this family. They included, but were not limited to, records of communications to and from DCF to the parents, the children, foster parents and service providers. These narratives had been sought by both the mother and father in preparation of the trial. DCF acknowledged that the social worker(s) for that time period would not be able to testify with any independent recollection of the events of that period. Instead, it was represented to the court that these social worker witnesses would rely on their social studies and/or affidavits, which were prepared from the narrative, before it became missing for that time period. The absence of the narratives would deprive the parents of the ability to meaningfully prepare and cross-examine the social worker witnesses for that time period. Pursuant to Practice Book § 13-14, the court ordered that the petitioner was barred from offering evidence in support of its petitions for the period of time from September 15, 1995 through December 3, 1996. The court further ordered, however, if either parent introduced evidence from that covered period in defense against the petitioner, then DCF could present rebuttal evidence from the covered period.[3]
The standard of proof for petitions for the termination of parental rights is clear and convincing evidence. The adjudication date is May 14, 1998.
At the inception of the trial, the mother, Linda C., raised for the first time the possibility of North American Indian heritage of herself and the children. Her affidavit presented to the court did not allege sufficient facts for the court to conclude that the proceedings were subject to the Indian Child Welfare Act. However, the court directed the Attorney General's Office to make inquiries regarding the same on an expedited basis. After filings from the Mashentucket Pequot Tribal Nation disclosed no tribal assertion of interest in these proceedings or the children in any way subject to the Indian Child Welfare Act. CT Page 10173 The court finds that the mother provided no information indicative of her or the children's tribal membership in a North American Indian tribe. The court concludes that these proceedings are not subject to the Indian Child Welfare Act.
The mother, father and children were each represented by their own counsel throughout these proceedings. The children's counsel supported the DCF petitions. Mother and father vigorously defended against them. Both the mother and the father presented witnesses and evidence at trial. The minor children's counsel participated in the examination of the petitioner's and DCF's witnesses. The trial of these matters continued for three days. The court heard testimony from DCF workers and supervisors, a DCF aide, Dr. Bruce Freedman, a clinical psychologist who was the court appointed evaluator, a principal of one of the children's schools, a special education supervisor in one of the son's school system, two police officers, a therapist for Daniel C., Jr., a psychiatrist who evaluated both children, the father, the DCF Director of Adoptive Services, the coordinator of a substance abuse treatment program for the mother, and a substance abuse counselor for the father. These were various documents in the court file of which the court took judicial notice. There were 26 full exhibits.
The court carefully considered all of the evidence presented at trial. The court applied the burdens of proof applicable to each portion of the coterminous petitions as detailed above. Only evidence relevant to adjudication dates were considered as a part of adjudication findings on the neglect and termination petitions.
The Motions for Contempt were filed by the father and mother on June 15. 1999. The DCF interposed an objection on June 21, 1999. The import of the motions is that DCF denied visitation in June, 1999 to the parents in violation of a court order of visitation issued on October 5, 1998. DCF denied the visitation after it learned that the mother had once again relapsed into substance abuse. They required confirmation of treatment before resumption. Notice of this new requirement was received too late for compliance to be made before the next scheduled visitation date. While DCF' s conduct violated the strict language of the court order as to both the mother and, certainly the father, under the circumstances, this court does not find that DCF's violation of the court order was willful. It was the intention of DCF to safeguard the children and still allow visitation, even if CT Page 10174 somewhat delayed. It was not DCF's intention to deprive the parents of visitation. The Motions for Contempt are denied.
Neglect Adjudication
On April 9, 1998 an ex-parte order of temporary custody of these two children was granted to DCF. That order remains in effect today and is not contested by either parent.
On that same date, petitions for neglect were filed by DCF, in which it is alleged that the mother was alcohol intoxicated and abusing heroin, while the children were in her care. The petition also alleged that the father was alcohol intoxicated while the children were in his care. It was further alleged that he was fired from his employment because he was stealing to support his wife's heroin habit. It was also alleged that the parents engaged in physical fighting while caring for the children, and, the children had witnessed the violence. Further, it was alleged that the children were not sent to school as they should have been.
These two children had, recently been committed to the custody of DCF, the period of commitment starting from May 21, 1996 to October 16, 1997. The major reason for that commitment had been the parents' active drug and alcohol abuse. The children had been living with their mother and father continuously from October 16, 1997 to April 6, 1998.
In March, 1998, while the children were in the parents' care, DCF received two complaints regarding the childrens care.
On April 6, 1998, a third referral since the children's return to their parents came to DCF from the West Haven Police Department. On April 6, 1998, officers of the Department went to the family residence. The home was a mess with piled garbage on the kitchen floor. The mother had cuts and bruises on her face. She was dirty and intoxicated. Daniel C., Jr., the son, had red marks on his back, the back of his neck and the side of his face. The injuries to Daniel Jr., as he and his sister Kimberly reported, were caused by his mother. The mother's injuries were caused by the father. The police were called by a neighbor. Daniel Jr. had run away from his home to the neighbor's home. Both children were taken into DCF custody on April 6, 1998, on a 96 hour hold. CT Page 10175
The father later reported that he and the mother had been fighting. He had lost his job because of stealing. He stole to get money, about $200 to $300 a day, to buy the mother p-dope, a synthetic heroin. He had been drinking, and drunk, since losing his job several days earlier.
DCF had visited the family home in March, 1998 in response to complaints. It appeared orderly. The home on April 6, 1998 was filthy, chaotic and smelled of alcohol.
The mother was hospitalized and placed at Yale Psychiatric Institute. She reported that since a DCF requested substance abuse evaluation in March, 1998, she had been taking 1-2 bags of heroin, daily. During this entire time, the children were in her care.
Pursuant to court order, the family participated in a psychological evaluation, performed on October 19, 1998 and October 29, 1998. The evaluation was requested by the court in considering the petitions to terminate the parties' parental rights. The findings are also relevant to the neglect proceedings. By testing, the mother was found to have an average intellectual ability. The father also has average intellectual ability.
Daniel C., Jr. was 9 years old at the time of the evaluation. He reported that he had, in his life, been in too many foster homes to recall the number. His parents have repeatedly relapsed into drinking and fighting, resulting in his removal. Daniel Jr. is a child with many specialized needs. His tests reflect a borderline level of intellectual functioning. He suffers from a high level of emotional distress, with many worries about his life and his needs for attention, affection, and security. His behavior in schools and his foster homes is often highly agitated and unfocused. He is often defiant. Daniel Jr. (and Kimberly) had an individual psychiatric evaluation at Yale Child Study Center about the same time as the court-ordered psychological evaluation. His medical history discloses a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD). The evaluation questioned the effectiveness of his medication and recommended regular counseling to address his anxiety and worries.
Kimberly C. was 7 years old at the time of both evaluations. The psychiatric evaluation at Yale Child Study Center reported her to be cognitively impaired and anxious as well. While she CT Page 10176 expressed insecurities and worries, her younger age and milder acting out compared to her brother resulted in minimized concerns for her in the court-ordered psychological evaluation.
Both children acknowledged witnessing domestic violence between their parents. They saw their parents hit each other. The father was so abusive of the mother over the period of April 4 to April 6, 1998 that he left bruises and scratches on her. The witnessing of this violence is unhealthy for the children; it is relevant to this court as an adverse conclusion to the parenting skills of the father and the mother. Knock v. Knock,227 Conn. 776, 777-778 (1993).
The mother's physical assault on Daniel C., Jr. occurred in the presence of Kimberly C. This resulted in both children being unsafe and feeling unsafe with her. The father failed to protect Daniel C., Jr. from his mother's violence.
The fighting, physical abuse, intoxication of both parents and heroin abuse by the mother rendered them unable to provide a safe and nurturing home for their children. The parents have failed to protect Daniel, Jr. and Kimberly, having denied them proper care and attention, and, having permitted them to live under conditions and circumstances injurious to their well-being.In re Jessica M., 49 Conn. App. 229, 242, cert. granted,247 Conn. 915. (1998). The court finds, as of the adjudication date of April 9, 1998, that Daniel C., Jr. and Kimberly C. were neglected children, neglected by both of their parents.
Termination Adjudication
This family has a long history of parenting difficulties dating long before March and April, 1998. The mother had her parental rights terminated as to two other children on April 29, 1982.[4]
As stated previously, Daniel C., Jr. was born on July 3, 1989. Daniel Jr. was born premature as a result of a heroin overdose by his mother. Three months after his birth, Daniel Jr. was removed from his parents' care. He remained in DCF (DCYS) custody after court hearing on the OTC on November 2, 1989. Daniel Jr. was adjudicated neglected and committed to the custody of DCF on February 15, 1990. This continued until November 16, 1990 when he returned to the custody of his parents. He therefore was in DCF (DCYS) custody for twelve months of his first fifteen CT Page 10177 months of life. He was able to be returned after his parents had engaged in treatment for substance abuse and attained sobriety, at that time. This stabilized situation remained until April 17, 1995. In the interim, Kimberly C. had been born on December 16, 1991. Daniel C., Jr. had resumed his home with his family for four years, five months. For the entire first 3 years, 4 months of Kimberly's life she had lived with her parents.
The children were once again placed in foster care on April 17, 1995 because the parents had resumed alcohol use, were unable to care adequately for their children, and were engaging in domestic violence in the home. The children were both afraid to go home. They remained in DCF care.
On December 15, 1995, both children were adjudicated neglected. They were placed in protective supervision, living at home. This was Daniel Jr.'s second time that he was adjudicated neglected in his first 7 years of life.
The children were in DCF custody from April 17, 1995 to December 15, 1995 before the protective supervision commenced.
The return of Daniel Jr. and Kimberly to their parents' home was short lived. Seven weeks later, on February 2, 1996, new Orders of Temporary Custody placed the children once again, in DCF care. They remained there until May 23, 1997. They were in foster care, this time for almost 16 months. After their return to their parents they remained home until April 9, 1998 for 10 months. They now remain in DCF care.[5]
Daniel Jr. has been removed four times from his home, Kimberly three times. The parents' relapses into substance abuse has been the primary reason for removal each and every time. These relapses have occurred notwithstanding service referrals and support provided by DCF over many years.
After Daniel Jr.'s birth in July, 1989, DCF provided Visiting Nurse Services to the family. Daniel Jr. was initially removed from his parents by a 96 hour hold and then an Order of Temporary Custody on October 6, 1989. A coterminous neglect and termination of parental rights petition was also filed. Daniel Jr. was adjudicated neglected on February 15, 1990. Daniel Jr. was in DCF (DCYS) custody because of substance abuse by both parties and serious domestic violence between them. CT Page 10178
Court ordered expectations were issued and reported successfully complied with. While Daniel Jr. was in foster care, his father attended alcohol abuse treatment at the Veterans Hospital. He and his wife had couples therapy at Southern Connecticut State University. He attended AA meetings regularly. The mother, Linda C., attended treatment at Connecticut Mental Health Center. She participated in 12 step programs.
Daniel Jr.'s commitment was revoked as of November 16, 1990, at which time he was placed under an order of protective supervision. Further expectations were set. The protective supervision was terminated effective April 25, 1991.
Daniel Jr. and Kimberly lived with their parents from that time until April 17, 1995. On that date another Order of Temporary Custody issued, putting the two children in the custody of DCF (DCYS). The court found the children in imminent danger from their surroundings. The parents had relapsed again. They were intoxicated with the children at home. They went to Florida for rehabilitation to the National Recovery Institute. Upon their return from Florida, the father was ordered to follow up at the VA Hospital. The mother was offered various services. Neither parent wanted their services coordinated for them by DCF. The parents had visitation with the children. It was briefly suspended in July, 1995 when there was a report to DCF that they were drinking again. The DCF worker made appointments for the parents at Milford Mental Health which they did not attend. The parents were ordered by the court to sign releases and provide information regarding their urine screens and attendance at rehabilitation programs.
On December 15, 1995, the parents pled no contest and both children were adjudicated neglected. The children were returned to their parents under protective supervision for a period of 6 months. Expectations were ordered by the court as follows:
 1. Keep all appointments set by or with DCF. Keep whereabouts known to DCF and your attorney.
 2. Participate in counseling — drug/alcohol, follow-up program.
3. Follow recommendations including random urine screens.
4. Cooperate with 4C's parent aide program. CT Page 10179
5. Sign releases as requested and reviewed by your attorney.
6. Secure/maintain adequate housing and income.
7. No substance abuse.
8. Assure children's attendance at counseling.
This protective supervision continued until the parents failed to comply with the expectations and jeopardized their children's well-being by relapsing into substance abuse again. On February 2, 1996, only seven weeks after they had returned home, the court granted DCF an Order of Temporary Custody. At that time, both parents had relapsed again and the mother had called DCF to pick up the children because the parents needed to go into treatment. They were believed to be in California seeking treatment. The parents failed to appear for court on a motion to modify disposition filed by DCF. The disposition of the neglect adjudication of December 15, 1995 was The DCF worker made appointments for the parents at Milford Mental Health which they did not attend. The parents were ordered by the court to sign releases and provide information regarding their urine screens and attendance at rehabilitation programs.
On December 15, 1995, the parents pled no contest and both children were adjudicated neglected. The children were returned to their parents under protective supervision for a period of 6 months. Expectations were ordered by the court as follows:
 1. Keep all appointments set by or with DCF. Keep whereabouts known to DCF and your attorney.
 2. Participate in counseling — drug/alcohol, follow-up program.
3. Follow recommendations including random urine screens.
4. Cooperate with 4C's parent aide program.
5. Sign releases as requested and reviewed by your attorney.
6. Secure/maintain adequate housing and income.
7. No substance abuse. CT Page 10180
8. Assure children's attendance at counseling.
This protective supervision continued until the parents failed to comply with the expectations and jeopardized their children's well-being by relapsing into substance abuse again. On February 2, 1996, only seven weeks after they had returned home, the court granted DCF an Order of Temporary Custody. At that time, both parents had relapsed again and the mother had called DCF to pick up the children because the parents needed to go into treatment. They were believed to be in California seeking treatment. The parents failed to appear for court on a motion to modify disposition filed by DCF. The disposition of the neglect adjudication of December 15, 1995 was modified on May 21, 1996 and the children were committed to DCF until May 21, 1997. At that time, for the second time, DCF expressed on the court record an intent to pursue a petition for termination of the parents' rights to the children.
The court once again put into place the previous court ordered expectations. Upon return to Connecticut, the father was referred to programs for rehabilitation and treatment at Milford Mental. Health Clinic and St. Raphael's. The mother was referred to St. Raphael's as well for outpatient substance abuse treatment. The parents visited with the children.
On May 20, 1997, the court extended the commitment of the children. On May 23, 1997, the children were placed with their parents. The parents had some problems with Daniel Jr. He was kicked out of summer camp. The parents tried to work with the children and scheduled them to attend the Child Study Center. The mother felt she was being lenient because of the history with her children. During this period, DCF provided the 4C's program to the family. On October 16. 1997, the commitment of the children was revoked. The children remained with their parents until their removal in April, 1998. Those events have been described above.
Dispositional Facts
After the parties' relapses in April, 1998, the father pursued services for his addiction. He was admitted to South Central Rehabilitation for detoxification. Thereafter, he attended Multicultural Ambulatory Addiction Services (MAAS), commencing May 13, 1998. He stopped attending treatment in mid-August, 1998. He was discharged in October, 1998, with clean CT Page 10181 urine screens reflected to his last dates of treatment. He claimed he stopped attending because transportation and employment schedules blocked his continued attendance.
On April 19, 1999 he was readmitted to MAAS, referred by the South Central Rehabilitation Program, for substance abuse relapse again. He is once again at the beginning stages of his treatment. While his urine tests and breath tests have been negative for substance abuse in the past two months, he is now being referred to the VA Hospital for treatment for substance abuse problems and post traumatic stress disorder (PTSD) problems. He has been, recommended to go inpatient but has resisted that for the present.
By the father's own testimony, he was sober for 22 months before April, 1998. Thereafter, he was sober for about 12 months and then has relapsed again as recently as two months before this trial. He requests another opportunity to rehabilitate so that he may resume care of his children.
These children have spent many months and years in foster care, waiting for their father to regain his sobriety so that he can responsibly parent. He has not on any occasion in 1995, 1998, or 1999 been able to maintain his sobriety. This awful cycle cannot continue for these children on some hope or promise that this time their father will remain sober. Their childhood is fleeting and remains unsettled. Their hope for a future demands a clear-eyed understanding of their father's cyclical disease and its adverse effect on their well-being.
The father argues that DCF did not provide him with services since the children were removed in April, 1998. Unrebutted, his DCF worker related that he refused services, indicating that he would utilize VA Hospital services. He never requested services. He was never denied services. He attended programs to assist his rehabilitation.
When the children were removed in April, 1998, their mother was admitted to Yale New Haven Hospital and then sent to Yale Psychiatric Institute for detoxification. Thereafter, she received treatment from South Central Rehabilitation Center on April 28, 1998. She was referred to the Grant Street Partnership where she performed an intake interview on May 5, 1998 for treatment for substance abuse. She provided information of past treatment before 1998 at a variety of institutions in 1970, 1985 CT Page 10182 (Rushford), 1993, 1996, and 1998. She reported that she started drinking alcohol at age 15. She related a substance abuse problem with alcohol and heroin. Her longest time clean over all the years is 21 months. On May 5, 1998, she reported she was at the Grant Street Partnership that her current need for help resulted from a drug overdose on April 28, 1998, from alcohol and heroin. Her consumption of alcohol and heroin was reported to be daily. She also reported cocaine abuse over the years, last used in 1996. On May 18, 1998, the mother tested positive for cocaine on a random urine screen. The mother was discharged from the Grant Street Partnership Program within three weeks, on May 22, 1998 for noncompliance.
On June 23, 1998, the mother went inpatient for treatment at Stonington Institute, having been referred by her detoxification clinician. There she disclosed that she had commenced heroin use intravenously at age 16. In the 12 months from June, 1997 to 1998 she was using 6 bags of cocaine weekly. She remained in patient at Stonington to August 11, 1998, at which time she was discharged sober with directions to follow-up with nightly AA/NA type meetings and an aftercare provider. Her prognosis was described only as fair because of her long, entrenched history of substance abuse.
The mother commenced treatment at the APT Foundation Women in Treatment Program three months later on November 20, 1998. She remains in treatment with this program through the time of trial. Her treatment includes a methadone maintenance program and counseling on issues of domestic violence and other women related issues. She reports daily for methadone maintenance.
On April 1, 1999, the mother reported to her methadone maintenance program that she was going into a facility to detoxify from alcohol abuse. She spent four days there. Upon leaving she resumed drinking alcohol. She resumed her counseling and methadone maintenance services with the APT Foundation.
On June 5, 1999, a DCF social worker appeared at the parents' home with the children for a scheduled visit. The house was in some disarray with a broken window. The mother reported there had been a fight there the previous evening between her older son and his girlfriend. However, the parents' bedroom, which had been well kept was disorganized and disheveled in appearance. The mother told the social worker that she had gone to the liquor store and had started drinking alcohol again. She told the worker CT Page 10183 she was having trouble handling stress. The DCF social worker recommended she return to AA again.
The children's mother's long history of substance abuse. addiction. sobriety and relapse has nothing in it to suggest, with any credibility, that she can regain and maintain her sobriety so that her children can be returned to her now or any time in the foreseeable future.
The Children
Daniel Jr. was born July 3, 1989. He is presently 10 years old. He was 8 1/2 years old at the time of the filing of the petition to terminate his parents' rights to him.
Daniel Jr. has had a difficult life. He was born prematurely as a result of a drug overdose of his mother. He spent his first year of life in foster care (after 3 months) because of his parents substance abuse. He went home thereafter for 4 years, 5 months (November 16, 1990 — April 17. 1995). His family had no DCF involvement during that time. However, his mother has acknowledged her longest time without substance abuse of heroin and alcohol is 21 months. Therefore, over half of this time he was home, she was abusing substances even if it did not come to DCF's attention. She could not be said to have been rehabilitated during this time.
Daniel Jr. did not attend school regularly in the school year commencing fall, 1994. At that point he was 5 years old in kindergarten. For the period of August 16, 1990 to April 24, 1995 (when he was withdrawn upon removal from the parents) he attended school 103 days and was absent 39 days. He missed well over a quarter of his school during the time while he was in his parents' care that year (with no explanation offered.)
In the fall of 1997, the school system performed a psychological evaluation of Daniel C., Jr. He was referred for the evaluation because of a myriad of classroom problems: not obedient to rules, poor concentration, behavior problems, poor skills in reading, writing, phonics and math, delayed fine motor skills, and poor impulse control. While he was observed to be restless, he is an anxious, eager to please, polite child. He craves attention. His intellectual capacity was adjudged to be average. The evaluation made recommendations for instructional strategies to help overcome his problems. CT Page 10184
In 1995, DCF and his parents were concerned about Daniel Jr.'s behavior. He was referred to a local Child Guidance Clinic for counseling. At that time he was displaying sexualized behavior. He was discharged in March, 1996. He was diagnosed with ADHD and a generalized anxiety disorder. He has taken medication since then. The medication has not sufficiently addressed his agitation, anxiety and impulsivity. Daniel Jr. remains a child with special educational and emotional needs. In July, 1997, while in his parents' care he was kicked out of summer camp for fighting.
Daniel Jr.'s behavior has created substantial problems in his foster placements. In January, 1999 he was moved from his placement. His school placements have been both in the main stream and in segregated special education environments. Prior to his current placement, he has had treatment at Elmcrest and another outpatient facility.
Daniel Jr.'s current foster placement is on the same neighborhood block as Kimberly's. They see each other daily. This has made him more content. While he still has some behavioral difficulties, he gets along with his current foster family. He has been in this placement since February, 1999. This foster family will keep him as long as DCF will allow.
Daniel Jr. and Kimberly have visited regularly with their parents during their foster care. The visits have varied from mid week to weekend, based on employment and school needs and distance' of foster placement. DCF has facilitated visitation regularly and consistently. This has fostered the relationship between the children and their parents. When the parents are sober they both display fine parenting skills. In the court ordered psychological evaluation the father showed easy interaction with Daniel Jr.
Daniel Jr. has strong loyalty to his parents. His feelings are mixed, however, because of their substance abuse. Initially, on his most recent removal he expressed a desire never to return to his parents. However, his loyalty to them and continued contact with them through visits has resulted in the maintenance of bonds with them. Unfortunately, the constant substance abuse and repeated loss of custody of the children has resulted in Daniel Jr. feeling very insecure and concerned about his parents' well-being and health. CT Page 10185
David Jr. is a troubled child and needs a secure and stable home. The insecurity and anxiety he feels must be alleviated. He cannot continue to be subjected to the cycle of addiction, between relapse and sobriety, that has resulted in his removal from his parents' care four times in his nine (9) years. To allow these parents further time to attempt rehabilitation yet again is to condemn Daniel Jr. to an entire childhood of instability: nine years is too much, already. In re Luis C., 210 Conn. 157, 167
(1989).
Kimberly is presently 7 1/2 years old. She was 6 years old at the time of the filing of the petition to terminate her parents' rights to her. In those 6 years, she had been removed from her parents' home 3 times because of their relapses into their respective addictions.
Kimberly presently is in a foster home that has worked well for her. She has been there about one year. Her foster parents want to adopt Kimberly if she is freed for adoption. She is treated as a member of the household and as a sibling of the other children. She calls her foster parents, Mom and Dad. Across the street are her foster grandparents who she treats as her real grandparents.
Kimberly continues to visit with her biological parents, with her brother Daniel Jr. She appears to enjoy her visits. She has not expressed a longing for her parents to caregivers or service providers when she is not with her parents.
While Kimberly has tested in one instance to be of average intelligence, she has had some difficulties in school. It was necessary for her to repeat Kindergarten. In her first year of Kindergarten she was in her parent's care. From the commencement of school in September, 1997 until she was removed from her parents' care in April, 1998, she was present for 107 days of school and absent for 40 days of school. Her school principal characterized this as a high number of absences.
Kimberly has been described as a needy child who whines for attention. Dr. Freedman found her intellectual capacity to be in the borderline range. She has some problems with motor skills and her verbal skills are weak. She is eager to please. In regard to her care for her parents, she expressed the desire for them to stop using drugs and drinking so that she could go home to them. CT Page 10186
Both of these children have experienced life through the cycle of foster care/home care and relapse/sobriety. Their parents have provided them no stability. Neither parent has maintained a rehabilitated state necessary for the long-term, sustained care of their children.
Neither parent offers a plan for obtaining and maintaining their sobriety. Neither parent, at trial, offered a timetable for when they would be ready for the children to return to their care or to assume a constructive and useful role as parents. Both parents had once again relapsed into their addictions within two months of trial.
DCF claims that the biological mother and biological father's parental rights should be terminated, claiming that Daniel C., Jr. and Kimberly C. have each been denied, by reason of an act of commission or omission of each of their parents, the care, guidance or control necessary for their respective physical, educational or emotional well-being. Connecticut General Statutes § 17a-112(c)(3)(C).
The court recognizes that the statutory language does not limit the acts of commission or omission to the serious physical injury of a child, but instead includes serious emotional injury.In re Sean H., 24 Conn. App. 135, 144, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991).
Daniel C., Jr. and Kimberly C. both are suffering emotionally, Daniel Jr. to a greater extent. "However, no specific conduct of the parents is proven to have caused this suffering. Cumulatively, it is a result of generalized deficient conduct and poor parenting during intoxication and drug abuse and instability in home life. The court finds that this has been a process rather than a specific act and therefore it does not give rise to a finding by clear and convincing evidence of a specific act or omission resulting in serious emotional injury. In reKelly S., 29 Conn. App. 600, 615-616, 616 A.2d 1161 (1992). This ground alleged by DCF as to each parent fails.
The court finds that DCF has proven by clear and convincing evidence that the minor children Daniel C., Jr. and Kimberly C. are minor children who have already been adjudicated neglected and that the father Daniel C. Sr. has failed to achieve such degree of personal rehabilitation, considering the age and needs CT Page 10187 of Daniel C., Jr. and Kimberly C., respectively, as would encourage the belief that he could assume a responsible position in either of their lives.
The court finds that DCF has proven by clear and convincing evidence that Kimberly C. was under age of seven year at the filing of the petition, and had already been adjudicated neglected, and her mother Linda C. has failed to achieve such degree of personal rehabilitation, considering the age and needs of Kimberly C., as would encourage the belief that she could assume a responsible "position in the life of Kimberly C., and Linda's parental rights of two other children were previously terminated pursuant to petitions filed by the Commissioner of Children and Families (or its predecessor in name).
The court finds that DCF has proven by clear and convincing evidence that Daniel C. Jr. has previously been adjudicated neglected and his mother, Linda C. has failed to achieve such degree of personal rehabilitation, considering the age and needs of Daniel C., Jr. as would encourage the belief that she could assume a responsible position in Daniel C., Jr.'s life.
REQUIRED FINDINGS
The court makes the following factual findings required by General Statutes § 17a-112(e). These findings supplement findings already recited earlier in this opinion.
1. Timeliness, nature and extent of services offered or provided to facilitate the reunion of child with parent. Visitation has been provided regularly. Both parents are veterans many times over in the substance abuse help field. Over the years they have been provided many referrals by DCF, as needed and when needed, and they have also self-helped themselves with self referrals. In addition to programs referenced above in the body of the opinion, the DCF over the time of its involvement with this family referred to them to the following services, or, the parents individually availed themselves of these services:
July, 1989 Visiting Nurse Association — upon Daniel C., Jr.'s birth
1989 — 1991 Veteran's Administration Hospital — alcohol abuse treatment[6] for father CT Page 10188
1989 — 1991 Connecticut Mental Health Center — mother for alcohol treatment
1990 Southern Connecticut State University — family therapy
1994 — 1995 National Recover Institute, Florida — treatment for mother's substance abuse and for father's alcohol abuse
1995 Milford Mental Health Center — treatment for mother and father for substance abuse
1995 Advanced Behavioral Health — substance abuse evaluation and treatment for father and mother
1995 Dr. Harvey Ruben — substance abuse counseling and psychiatric care for mother
1995 Dr. Ronald Marcus — alcohol and drug treatment for mother
1995 Coordinating Council for Children in Crisis (4C's) — substance abuse counseling for mother
1998 Yale New Haven Hospital — mother admitted and referred to Yale Psychiatric Institute for detoxification
1998 Advanced Behavioral Health — substance abuse evaluation treatment for mother and father
1998 — 1999 APT Foundation — mother
1998 — 1999 MAAS — father
1999 VA — father
Both parents periodically participated in 12 step programs, both on their own initiative and on DCF recommendations.
Both parents had psychological examinations by Dr. Campagna and Dr. Freedman.
Upon the filing of these petitions in April, 1998, DCF did CT Page 10189 not pursue reunification as a goal. However, as on two previous occasions with these parents where termination of parental rights petitions were filed or contemplated, services were still available. It was the parents' duty to rehabilitate so that reunion could occur.
2. Terms of any applicable court order, and the extent to which the parties have fulfilled their obligation under the order. The court order of visitation has been fulfilled by DCF except on one visit. The parents have frequently visited, but failed to attend some at the commencement of these proceedings. The parents have failed to remain free of substance abuse, which has been ordered in the past but not specifically as a part of these proceedings. Prior proceedings have had court ordered expectations. When the parents have been able to stabilize, they have been in compliance. They both have relapsed, over and over again, including this year.
3. Feelings and emotional ties of the child with respect to parent, and, any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed sufficient emotional tie. Daniel Jr. is very loyal to his parents and has significant emotional ties with, them. He also has anxiety and worry about their health and addictions. Kimberly has emotional ties to her parents as well. She has strong emotional ties to her foster parents, calls them mom and dad, and feels a part of their family.
4. Age of the child: Daniel C., Jr. born 7/3/89, presently 10, Kimberly C. born 2/16/91, presently 8.
5. Parent's efforts to adust to her circumstances to make it in the best interest of the child to return child to parent's home in the foreseeable future, including:
— extent of parental contact with child: adequate
— extent of parental contact or communication with child's guardian or custodian. While the parents have largely kept up their visitation with their children, they otherwise made inadequate efforts to adjust their circumstances so that the children can come home. Their relapses in April, 1998 (and then again this year) back into substance abuse, at such a pivotal time in the processing of these issues has resulted in an absolute conclusion that neither of them could be ready to care CT Page 10190 take these children any time in the foreseeable future.
6. Extent to which the parent has been prevented from maintaining a meaningful relationship with the child by unreasonable acts of child, other parent, or other person or by economic circumstances. The parents have not been prevented from maintaining a meaningful relationship with these children by acts of anyone or economic circumstances.
7. Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Child Welfare Act of 1980 as amended. Since the filing of these petitions in April, 1998, DCF has facilitated regular visitation between the parents and the children. They have made over the time of their involvement with this family, since 1989, regular and sustained efforts to reunite this family, which resulted in three different reunifications over the last decade. In the context of this family and these parents' long history of substance abuse, the court finds that DCF has made reasonable efforts to reunite this family.
It is in the best interest of these two children to proceed with termination of parental rights at this time for the reasons stated herein. They require stability. When the termination petitions were filed in April, 1998, these parents were not rehabilitated, having relapsed again. Now they have relapsed once again. The rehabilitation had failed as of the adjudication date. The parents' prospects have not improved and the children's insecurity remains. Kimberly has an adoptive home. Daniel Jr. is in stable foster care. These children cannot wait out the rest of their youth waiting for their parents to do what they have not achieved to date and have no plan or timetable for in the foreseeable future. In re Christina V., 38 Conn. App. 214, 220-1
(1995).
The court finds that the grounds for termination that have been granted have existed for in excess of one year. The addictions of these parents have existed in an active state for much of their respective adult lives, only briefly punctuated, on occasion by increasingly shorter and shorter spans of sobriety. Even if measured only since April, 1998, it would then be in the children's best interests to waive the one-year requirement. Connecticut General Statutes § 17a-112(d). These findings are made after considering each child's sense of time, need for a secure and permanent environment, the relationship that each has with the respective foster parents, and the totality of all the CT Page 10191 circumstances. In re Juvenile Appeal (anonymous), 177 Conn. 663,667-68, 673 (1979). See also, J. Goldstein, A. Freud A. Solnit,Beyond the Best Interests of the Child 99 (1979).[7]
Based upon the foregoing, the court finds by clear and convincing evidence that it is in the interest of Daniel C., Jr. and Kimberly C. to terminate the parental rights of their biological mother Linda C. and biological father Daniel C. Sr. It is ordered that the parental rights of the biological mother, Linda C. and Daniel C. Sr. in and to Daniel C., Jr. and Kimberly C. are hereby terminated.
It is further ordered that the Commissioner of the Department of Children and Families is appointed the statutory parent for the purpose of securing an adoptive family for these twin children. The Commissioner shall file with this court no later than 90 days following the date of judgment a report of efforts to effect such permanent placement and file further reports as are required state and federal law.
MUNRO, J.
[2] Because the court grants the petitions for termination of parental rights, the Motion for Unsupervised Visitation is rendered moot and therefore denied based on mootness.
[3] DCF in argument on the issue, as a remedy, had offered to limit its presentation of its case as specified in the court's ruling.
[4] This finding is relevant only to the ground for termination of parental rights of the parents of Kimberly C. alleged pursuant to Connecticut General Statutes § 17a-112(c)(3)(E).
[5] Because of the time line, this chart best lays out the history of Daniel Jr. and Kimberly's custody.
HOME DCF Care
1989 July 3, 1989 — Daniel Jr. born 7/3 — 10/6/89 (3 mos.)
October 6, 1989 — OTC 10/6/89-11/16/90 (13 mos.) CT Page 10192
1990 February 15, 1990 — Daniel Jr., adjudicated neglected
1991 December 16, 1991 — Kimberly born 11/16/90 — 4/17/95 (4 years, 5 mos.)
1995 April 17, 1995 — OTC 4/17/95 — 12/15/95 (8 mos.)
 December 15, 1995 — Both children, 12/15/95 — 2/2/96 adjudicated neglected (7 weeks)
1996 February 2, 1996 — OTC 2/2/96 — 5/23/97 children committed (15 mos.)
1997 5/23/97-4/9/98 (11 mos.)
1998 April 9, 1995 — OTC 4/9/98 — present (14 mos. — current)
[6] Treatment includes evaluation, testing and actual treatment.
[7] This text is referred to concerning the concept of permanency in placement. In re Angelica W., 49 Conn. App. 541,553 (1998).